ACCEPTED
04-14-00682-CR
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
2/18/2015 2:05:12 PM
KEITH HOTTLE
CLERK

IN THE COURT OF APPEALS

FOURTH SUPREME JUDICIAL DISTRICT

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS

2/18/2015 2:05:12 PM

KEITH E. HOTTLE
Clerk

SAN ANTONIO, TEXAS

---

| | | |
|---|---|---|
| BENITO GARZA | § | |
| VS. | § | NO. 04-14-00682-CR |
| STATE OF TEXAS | § | |

BRIEF FOR APPELLANT

---

On Direct Appeal from Cause No. 2013CR9168
In the 187TH District Court
Bexar County, Texas

---

CAMPION & CAMPION

ALEX J. SCHARFF
State Bar No. 17727350
222 E. Main Plaza
San Antonio, Texas  78205
Telephone No. 210/227-5161
Telecopier No. 210/229-1243
alexjoss@yahoo.com
cindy@campionlawfirm.com

ORAL ARGUMENT NOT REQUESTED

1

## STATEMENT OF PARTIES

In accordance with Texas Rule of Appellate Procedure 72(a), for the purpose of disqualification and/or recusal of members of this Honorable Court, the following is a complete list of those parties involved in the instant action:

1) Benito Garza, Appellant

2) Alex Scharff, Appellate Attorney for Appellant; Trial Attorneys: Antonio Balderas, Marisa Balderas

3) Mary T. Green, Jessica Schulze, Bexar County District Attorney's Office, for the State at trial; Appellate Attorney designate for Nicholas LaHood, District Attorney

4) The trial judge was the Honorable Raymond Angelini, of the 187th District Court.

# TABLE OF CONTENTS

Page

Statement of Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Index of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Record References and Word Count of Compliance. . . . . . . . . . . . . . . . . . . . . 5

Statement of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**POINT OF ERROR ONE: THE APPELLANT WAS EGREGIOUSLY HARMED WHEN THE TRIAL COURT FAILED TO GIVE A UNANIMITY INSTRUCTION TO THE JURY**

Summary of the Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**POINT OF ERROR TWO: THE ERRONEOUS JURY CHARGE EGREGIOUSLY HARMED GARZA**

Summary of the Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Prayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

## INDEX OF AUTHORITIES

Texas Cases                                                                        Page

Allen v. State, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008). . . . . . . . . . . . . . 35

Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)
(Op. On reh'g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Arrington v. State, ____S.W.3d ___, No. PD-1448-13, 2015 Tex. Crim. App.
LEXIS 15 (Tex. Crim. App. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Cosio v. State, 353 S.W.3d 776-7 (Tex. Crim. App. 2011) . . . . . . . . . . . . . . . 29

Gelinas v. State, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013). . . . . . . . . . . . 30

Ngo v. State, 175 S.W.3d 738, 743-744 (Tex.Crim.App. 2005). . . . . . . . . . . . 29

Reeves v. State, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013) . . . . . . . . . . . . 35

Warner v. State, 245 S.W.3d 458, 262 (Tex. Crim. App. 2008) . . . . . . . . . . . . 35


Statutes

Tex. Pen.Code Ann. § 29.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Transportation Code, Section 541.201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Transportation Code, Section 46.01. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Transportation Code, Section 49.01. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## RECORD REFERENCES

In this brief the Clerk's record will be as follows: (CR-page); references to the court reporters's statement of facts will be cited as follows: (RR-page). Should there be multiple volumes, the volume number will cited–e.g. [fourth volume] as (4RR-page). Trial exhibits will be cited to the volume number and to the number of the exhibit, e.g. (3RR-SX 34)


## WORD COUNT CERTIFICATION OF COMPLIANCE

Pursuant to T.R.A.P. 9.4(i)(3), the word count, from the beginning with the Statement of the case on page eight until, but excluding the signature block is 9161. This is a computer generated document created in WordPerfect, using 14-point interface for all text, except for footnotes, which are in 12 point typeface. The word count is provided by the software and is relied upon by the undersigned.

## STATEMENT OF THE CASE

Benito Garza, hereinafter referred to as Appellant, appeals his conviction for felony murder and 60 year sentence out the 187th District Court of Bexar County, Texas, in cause number 2013CR9168, Honorable Judge Raymond Angelini, presiding. After a jury found Appellant guilty of murder, Appellant was sentenced by the jury to serve 60 years in prison with a $0 fine. The jury found it to be true that Appellant had been once before convicted of Possession of a Controlled Substance in an amount over four grams but less than 200 grams. The jury also found that a deadly weapon had been used in the commission of the offense. The Judge sentenced Garza accordingly. The Appellant timely gave notice of appeal.

IN THE COURT OF APPEALS

FOURTH SUPREME JUDICIAL DISTRICT

SAN ANTONIO, TEXAS

---

| | | |
|---|---|---|
| BENITO GARZA | § | |
| VS. | § | NO. 04-14-00682-CR |
| STATE OF TEXAS | § | |

BRIEF FOR APPELLANT

---

On Direct Appeal from Cause No. 2013CR9168
In the 187TH District Court
Bexar County, Texas

---

CAMPION & CAMPION

ALEX J. SCHARFF
State Bar No. 17727350
222 E. Main Plaza E
San Antonio, Texas 78205
Telephone 210/227-5161
Telecopier 210/229-1243

## STATEMENT OF FACTS

The Appellant was charged in a one count indictment for the the offense of the murder of Pedro Tenorio, enhanced by one prior felony convictions. (CR-5). Paragraph A alleged that on September 21, 2012, Garza committed or attempted to commit the felony offense of evading arrest in a vehicle and while in the course of or in furtherance of or in immediate flight from the commission or attempted commission of this offense, Garza did then and there commit or attempt to commit an act clearly dangerous to human life to-wit,

DRIVING A MOTOR VEHICLE AT A SPEED THAT WAS NOT REASONABLE OR PRUDENT UNDER THE CIRCUMSTANCES THEN EXISTING, DRIVING A MOTOR VEHICLE AND FAILING TO APPLY THE BRAKES IN A TIMELY AND REASONABLE MANNER AND/OR DRIVING THE MOTOR VEHICLE INTO ONCOMING TRAFFIC, DRIVING A MOTOR VEHICLE AND ATTEMPTING TO PASS ANOTHER MOTOR VEHICLE WHEN IT WAS NOT REASONABLE AND PRUDENT UNDER THE CIRCUMSTANCES THEN EXISTING, DRIVING A MOTOR VEHICLE AND FAILING TO MAINTAIN A SINGLE LANE OF TRAFFIC, DRIVING A MOTOR VEHICLE AND FAILING TO TAKE NECESSARY EVASIVE ACTION TO AVOID COLLIDING WITH ANOTHER VEHICLE IN/ON WHICH THE COMPLAINANT WAS A DRIVER OR PASSENGER WHICH CAUSED THE DEATH OF AN INDIVIDUAL, NAMELY: PEDRO TENORIO."

Paragraph B of the indictment alleged that on or after the 21st day of September 2012, BENITO GARZA...did then and there commit or attempt to commit the felony offense of Robbery/Threats and in furtherance of or in immediate flight from the commission or the attempted commission of this offense, the defendant did then and there commit or attempt to commit an act clearly dangerous to human life, to-wit:

8

DRIVING A MOTOR VEHICLE AT A SPEED THAT WAS NOT REASONABLE OR PRUDENT UNDER THE CIRCUMSTANCES THEN EXISTING, DRIVING A MOTOR VEHICLE AND FAILING TO APPLY THE BRAKES IN A TIMELY AND REASONABLE MANNER AND/OR DRIVING THE MOTOR VEHICLE INTO ONCOMING TRAFFIC, DRIVING A MOTOR VEHICLE AND ATTEMPTING TO PASS ANOTHER MOTOR VEHICLE WHEN IT WAS NOT REASONABLE AND PRUDENT UNDER THE CIRCUMSTANCES THEN EXISTING, DRIVING A MOTOR VEHICLE AND FAILING TO MAINTAIN A SINGLE LANE OF TRAFFIC, DRIVING A MOTOR VEHICLE AND FAILING TO TAKE NECESSARY EVASIVE ACTION TO AVOID COLLIDING WITH ANOTHER VEHICLE IN/ON WHICH THE COMPLAINANT WAS A DRIVER OR PASSENGER WHICH CAUSED THE DEATH OF AN INDIVIDUAL, NAMELY: PEDRO TENORIO." (CR-5-6)

The indictment also alleged that Garza did use and exhibit a deadly weapon, to-wit: a motor vehicle that in the manner of its use and intended use was capable of causing death ans serious bodily injury, during the commission of this offense. (CR-6). Moreover the State alleged in the indictment that Garza had been previously convicted on the 19th day of March, 1998 of the felony offense of possession of a controlled substance in penalty group one, over four grams but less than 200 grams.(CR-6). After the jury was empaneled and sworn, but outside their presence and the trial court's presence, trial counsel inquired of Garza as to whether or not he would accept a plea bargain of forty years incarceration or a "cap" of forty-five years imprisonment, to which Garza refused to accept. (RR3-6-7).

The State called its first witness, Roxana Tenorio, the deceased' spouse, who testified she was riding on the back of a motorcycle with Pedro Tenorio as they traveled from Corpus Christi, Texas to San Antonio, Texas on September 21, 2012. (3RR-18,20). She stated she suffered numerous injuries but she only remembered coming into San

9

Antonio after passing Roosevelt St. (3RR-19).

Dora Hernandez next testified she saw "Mikey" pull up in a yellow Mustang, exit the vehicle, then run to the back "side of their house and was screaming across the street to us to call the cops." (RR-24). Dora then stated she saw a silver car "pull up" when a Hispanic male wearing gloves, khakis with a white and blue hat, exited the vehicle while carrying a gun on his side and walked to the end of the driveway of an empty lot. (3RR-26-7). Dora noted the license plate number of the silver car and told her sister, who was on the phone with the police. (3RR-27). Dora saw the man look around and then speed off. (3RR-27). Dora noted the silver car driver just stood at the end of a driveway for two minutes, never attempting to enter a residence. (3RR-29). Laura Hernandez corroborated Dora's story and gave a description of the man in the silver car who arrived near her address in the Indian Creek area of San Antonio. (3RR-33-41).

San Antonio Police Department (hereinafter SAPD) Officer Joe Carmona claimed he was on patrol when he heard the dispatcher state there was a home invasion in the Indian Creek area of San Antonio, 5159 Sagamore. (3RR-48). Carmona stated he was familiar with that address because it was known for narcotics and plus other police had interacted with the residents on numerous occasions because of the narcotics activity. (3RR-49). Carmona was receiving several dispatches and tried to catch up to SAPD Officer Nathan Zachary who was trying to catch up to a silver four door vehicle. (3RR-50-1). Carmona had arrived to the location and saw the suspect running through a parking lot in between school buses. (3RR-53). Carmona stayed in his car while the

10

other officers were chasing the suspect but then returned to 5159 Sagamore to speak to witnesses. (3RR-53).

SAPD Officer Nathan Zachary claimed he received a dispatch for a fight and a robbery a few streets away from where he was located. (3RR-59). He then stated he started traveling southbound on Five Palms towards the area of the call. (3RR-60). He then noticed a small gray Kia traveling in the opposite direction so he used his emergency lights to turn around to try to make a traffic stop of the Kia in his fully marked patrol car. (3RR-60). Officer Zachary continued to try to stop the person driving the Kia and had his lights and sirens on. (3RR-61). The driver of the Kia continued driving, but slowed down a bit, then pulled over but continued driving all the way to Old Pearsall Road and ran a red light. (3RR-62, 71). The Kia turned into a Shell gas station and continued to drive onto a dirt road parallel to the access road. (3RR-72-3). The chase stopped when the Kia entered the access road going the wrong way headed entered the exit ramp towards the highway. (3RR-73-4). Officer Zachary made his way to the highway and saw an accident take place between the Kia and two vehicles and a motorcycle. (3RR-74-5). The Kia's driver then exited his vehicle carrying a shotgun and began running so Officer Zachary chased him on foot toward an area where there are bus stations. (3RR-75-8). The Kia driver attempted to jump over the fence but was being held by another officer when a gunshot was heard. (3RR-78). Officer Zachary along with other officers then chased the man through the parking lot of the bus station. (3RR-79). Garza resisted arrest but was finally apprehended. (3RR-79). Officer Zachary identified Garza as the

11

person who was arrested leaving the scene of the vehicle accident on the highway. (3RR-80).

Michael Jay Flores stated he lived at 5159 Sagamore Drive in September 12, 2013. (3RR-90). Around 7 p.m., Flores was shaving when he heard his brother "kind of speaking loudly," so he walked out and saw his brother on the floor scared because he had been "robbed." (3RR-92). Flores claimed he then ran outside and saw the person who had "robbed us running down the street." (3RR-92). Flores then said he grabbed his car keys and started to pursue the running guy who robbed them. (3RR-93). As he followed the person, a small vehicle was blocking Flores' vehicle so Flores honked his horn until the vehicle turned to the left. (3RR-94). Flores continued pursuing the "robber' until Flores' noticed the robber was shooting at him. (3RR-96). Flores then reversed his vehicle and went straight back, slammed on his brakes, put the vehicle in drive, but was blocked by the gray vehicle, until it eventually moved out of Flores' way. (3RR-97). As Flores then drove home, he saw his little brother Jesus running down the street because he had heard gunshots. (3RR-98). Flores then noticed the same gray car coming back up the street, so he told everyone to go inside the house. (3RR-99). As the gray car pulled up, the driver asked him if everything was okay, to which Flores replied "Yeah, everything is okay...We're going to call the cops." (3RR-100). Flores yelled at his neighbor that "...we've been robbed." (3RR-100). Interestingly though, Flores did not call the police. (3RR-100). Flores claimed the driver of the silver car "started freaking out...because he told me 'Why are you calling the cops? What are you calling

12

the cops for?" (3RR-100). Flores then hid behind his neighbor's truck." (3RR-100). Flores believed the driver of the gray car had gloves on. (3RR-100). Flores claimed he saw the face of the driver of the gray car who then stopped the car and exited it and approached Flores. (3RR-101). Flores identified Garza as the driver of the gray car. (RR-102). Flores admitted he was on felony deferred adjudication community supervision for possession of methamphetamine with the intent to distribute out of the 175th District Court. (3RR-102-4). At this point, the trial court appointed an attorney, Charles Bunk, to represent Flores. (3RR-105). Flores admitted to dealing methamphetamine. (3RR-106). Flores admitted that drugs, particularly marijuana, were being sold out of the house where he was residing on 5159 Sagamore on the day of this event. (3RR-113-4). Flores clarified his testimony by stating he did not see Garza enter into his home on the day if the incident. (3RR-116-7). Flores did not identify Garza as the person who robbed his brother. (3RR-118). Flores did not establish any link between the person who robbed his brother and Garza, who drove the gray vehicle. (3RR-118).

SAPD Officer Manuel Reygadas testified he received a dispatch for a home invasion on September 21, 2012. (3RR-120). As he was looking for a gray car, he saw the driver of it evade Officer Zachary as the two cars sped past Reygadas. (3RR-122). Reygadas followed Zachary chase the gray car, of which the driver was speeding twenty-five miles over the limit. (3RR-124). Reygadas began secondary in pursuit and followed the gray car as it "cut through" the parking lot of the Shell Station. (3RR-124). Reygadas continued pursuing the gray car, which "took a hard left and came down the dirt road."

13

(3RR-125). Reygadas followed the gray car as the driver "took" a left turn and began to travel southbound in the northbound lanes of Loop 410. (3RR-126). Reygadas then discontinued the pursuit but turned around and headed northbound on 410, turned around on Pearsall Road and came around on the other side of the highway, traveling southbound onto the southbound lanes. (3RR-127). As soon as Reygadas "got on the highway," he and other police officers came across a crash scene on the other side of the highway, so he pulled his vehicle over, and jumped the fence. (3RR-128). Reygadas observed the "first" male victim, who appeared to be deceased. (3RR-128). While radioing in the incident, numerous witnesses approached him and starting pointing further down Loop 410, stating "He's over there, he's running." (3RR-129). The Officer saw other individuals pointing towards a running man and he himself saw Garza "at a medium jog carrying a shotgun, running down the access road. (3RR-129). The Officer and other policemen then chased Garza on foot. (3RR-129). There was a considerable distance between Garza and the police officers and Reygadas never actually caught up to Garza. (3RR-132). As the police were closing the distance to garza, Garza proceeded southbound on the access road, turned the corner and followed the fence line of the bus depot for the school district. (3RR-132). Once Garza tried to jump the fence, other police officers were able to apprehend Garza. (3RR-133). Beygadas admitted that he himself did not witness any collision between Garza and any other person or vehicle. (3RR-135).

Evelyn Sandoval, an eighteen year old female in 2012, stated she was with her mother and her sister at Ingram Park Mall shopping. (3RR-138). After shopping, the

14

three women were planning to stop at the Bill Miller's restaurant on Loop 410 and Old Pearsall Road. (3RR-138). As they were going to the restaurant, she heard "cop cars" with their sirens on, so her mother moved the car to the median and saw three "cop cars" coming from behind and heading straight "into the neighborhood." (3RR-140). She said she saw a little car coming, at first in the lanes he was supposed to, but then she saw him cross over to the opposite lane, driving through the gas pumps in the Shell station. (3RR-140). She then saw the car exit but saw it drive the wrong way into oncoming traffic. (3RR-141). She testified the car entered "the exit" and drove onto Loop 410 in the "opposite direction." (3RR-141). As she saw the vehicle come onto the exit ramp, her mother drove back under Old Pearsall Road and went back under Loop 410 and pulled up to the little access road that's on the side. (3RR-142). As her mother was turning, she started getting "some more of the access road before it got up to the hill part," and that is when she saw the person driving the blue vehicle hit another car. (3RR-143). She stated she saw the blue car in the fast lane but then saw the motorcycle and two people thrown in the street. (3RR-143). She noticed that no one was in the blue car anymore. (3RR-143). She observed the blue car to be smashed from the front and pulled off to the side. (3RR-143). She stated she saw one person driving the blue car. (3RR-144). Evelyn said her mother pulled over and saw a group of people around a female, so Evelyn brought some towels to help the female by placing them under her head. (3RR-144). That is when Evelyn said she saw a male, whose body looked like it was twisted up as he was lying on the highway. (3RR-144). When Evelyn approached the female to give her the

15

towels, she saw a man holding her head, talking to her and trying to calm her down. (3RR-145). Evelyn saw the female's left knee "was showing" and her bone looked like it was completely cracked, and she noticed the paramedics trying to put on a knee brace and that she already was wearing a neck brace. (3RR-145). She saw the paramedics putting the rest of the braces on her so they could put her on a stretcher. (3RR-145). At first, the female was in the ambulance, but then an Airlife helicopter landed on the highway and transported the female away from the scene of the accident. (3RR-145). The witness noticed that the airbags had been deployed in the blue car. (3RR-147). Evelyn said she saw another blue car (containing a male, female, and two small children), that looked like it had been hit by the oncoming car on the highway. (3RR-147). It was revealed on cross examination that Evelyn had mentioned that the car driving the wrong way on Loop 410 was actually gold colored. (3RR-148). Evelyn also clarified that she did not see any collision, only the aftermath of such. (3RR-150). She said the driver of the car was wearing a white T-shirt and looked like a rather young Hispanic male. (3RR-151).

`SAPD Officer Scott Foulke, a traffic investigation officer, was dispatched to the vehicle crash on Southwest Loop 410 near Christa McAuliffe School. (3RR-159). He stated he talked to other officers and witnesses at the scene and devised a plan to divert traffic that was backed up for two miles. (3RR-161). He also secured the evidence left at the scene. (3RR-162). After observing the scene, he concluded that in this case, there were several different impacts that had occurred. (3RR-163). Foulke's investigation revealed that the vehicle being pursued by the officers was a silver Hyundai Elantra.

16

(3RR-170). By examining the Hyundai, he found human tissue, blood, and paint from a motorcycle helmet on the vehicle. (3RR-176). Foulke also found the detached left arm of Pedro Tenorio laying in a ditch. (3RR-176). Foulke noted that the secondary crash was with Tenorio being run over by a Suzuki Reno. (3RR-180). The final resting place of Mr. Tenorio's motorcycle was in the "slow lane" of the highway. (3RR-184). Foulke explained the Suzuki Reno was involved in the secondary crash, caused by the initial crash. (3RR-185). Foulke claimed the initial crash was between the Hyundai Elantra and Mr.Tenorio's motorcycle. (3RR-186). The Suzuki then crashed into Mr. And Mrs. Tenorio's motorcycle. (3RR-186). After examining the Suzuki, Foulke concluded that Mrs. Tenorio was struck by the windshield, then thrown off to the right where she came to rest, partially on the on-ramp and partially in traffic. (3RR-187). Foulke admitted that he could not determine from his expert analysis that the driver of the Hyundai Elantra was driving at an unreasonable and imprudent speed under the circumstances. (3RR-188). However, Foulke claimed there was "no such thing" as a prudent speed when traveling on the wrong way of a highway. (3RR-188), Foulke also claimed that the driver of the Hyundai failed to apply brakes in a timely and reasonable manner. (3RR-188). Foulke concluded the driver of the Hyundai only came to a stop mechanically, due to the number of impacts. (3RR-189). He saw no evidence of brakes being applied by the driver of the Hyundai. (3RR-189). Foulke also, after answering numerous leading questions, stated that the driver of the Hyundai failed to take evasive action to avoid colliding with Mr. Tenorio's motorcycle. (3RR-190). Foulke surmised the driver of the Hyundai drove in

the fast lane. (3RR-190). Foulke also stated that the motor vehicle was a deadly weapon. (3RR-191). Foulke admitted that he could not tell what the physical state of Mr. Tenorio was prior to the impact with the Suzuki. (3RR-194). He also stated that Mr. Tenorio's arm arrived in the ditch because it was attached to the Hyundai, but that Foulke could not testify to Mr. Tenorio's cause of death. (3RR-195-6).

SAPD crime unit member David Sarabia testified he contacted Detective Foulke at the scene of the accident on Loop 410 and started taking pictures of the scene. (4RR-5). Sarabia noted that he took a picture of a loaded nine millimeter semi-automatic handgun in the center console of the Hyundai. (4RR-8).

Nicole Valadez-Moreno testified she was driving on Loop 410 to go meet her parents on September 21, 2012. (4RR-23). She stated she was driving sixty-five miles per hour in the fast lane in her dad's black car two car lengths behind a couple traveling on a motorcycle. (4RR-24-5). Nicole noticed the female on the motorcycle motioning up ahead to some police lights. (4RR-25). Nicole saw a headlight coming toward her in her lane of travel so she slammed on the brakes and veered to the left towards the grass, but in the process the motorcycle had turned and she hit the motorcycle. (5RR-25-6). Nicole said the motorcycle braked and "kind of fish tailed" to avoid the car traveling in the wrong direction, however the couple was no longer on the motorcycle when Nicole hit the motorcycle. (4RR-26). The witness could not explain what destroyed her windshield. (4RR-30).

Nicholas Herrera stated he was a passenger in the vehicle that Nicole Valadez-

18

Moreno was driving on Loop 410 on September 21, 2012. (4RR-32). Herrera stated he was traveling in the fast lane of Loop 410 next to a couple operating a motorcycle. (4RR-33). He believed he was about a car length from the motorcycle traveling between fifty five and sixty miles per hour. (4RR-33). After the driver of the motorcycle moved in front of Herrera, he noticed the headlights of an oncoming vehicle in the same fast lane. (4RR-33). Herrera saw the oncoming vehicle hit the motorcycle and then Nicole hit the motorcycle, which caused Mrs. Tenorio to hit his side of the vehicle on the passenger window. (4RR-35). Herrera believed Nicole's vehicle drove over either Mrs. Tenorio or the motorcycle. (4RR-39).

Roman Guerra was driving his company truck on Loop 410 on the day in question. (4RR-42). He stated he was driving in the slow lane of travel, but noticed a motorcycle, a little black sedan, and a maroon Expedition traveling in the fast lane. (4RR-43). He noticed Mr. Tenorio accelerating in the middle lane over to the fast lane. (4RR-44). Guerra saw police lights and heard sirens suddenly shut down when he looked forward and saw a vehicle coming towards his truck, traveling on the wrong side of the highway. (4RR-45). Guerra saw the wrong way vehicle crash into the motorcycle followed by the male and female hitting the ground. (4RR-46). Guerra went to the female and tried to stabilize her when he noticed one person wearing a red shirt exit the silver/gray car start running away towards a school bus station. (4RR-47-8).

SAPD Officer Jose Garay, also a tactical medic, stated he was at the scene of the Loop 410 accident on the day in question. (4RR-53). He was informed that Mr. Tenorio

19

had died so he went to check on Mrs. Tenorio and treated her injuries. (4RR-56-7). She survived the collision. (4RR-57).

SAPD Officer Ramon Moreno explained he was dispatched for a robbery in progress on the Southwest side of San Antonio. (4RR-59). He assisted in following other police officers who were trying to apprehend the suspect. (4RR-59). At some point he saw a man crossing underneath Loop 410 with a shotgun in his arms with two officers running behind him. (4RR-62). Moreno drove his car into a field to prevent the suspect from entering a wooded area. (4RR-63). The suspect then started to climb a six foot chain linked fence that had barbed wire on the top. (4RR-63). Moreno yelled for the man to stop when the man got hung up on the barbed wire, so Moreno ran up to him, put his hands on him, grabbed him, tried to hold on to him when the suspect fell over. (4RR-64). Moreno had the man at gunpoint and told him not to pick up his shotgun but the suspect "took off running again." (4RR-64). Moreno admitted that his firearm accidentally discharged during his struggle with the suspect. (4RR-64). Moreno identified the suspect as the Defendant, Benito Garza. (4RR-67).

SAPD Officer Vincent Hutnyak, patrolman on west patrol that covers the Indian Creek Subdivision, stated he received a dispatch for a robbery in progress at 5159 Sagamore. (4RR-79-80). On the way, Officer Zachary called out to Hutnyak that he was behind the suspect's car and Hutnyak saw Zachary chasing a vehicle. (4RR-80). During the pursuit, Zutnyak ceased the chase but saw "a bunch of people down there trying to get over the fence" so he went to try to also climb over the fence. (4RR-84). After he made

20

it over the fence, the Officer chased the suspect and yelled for him to "Stop, lay down, stop, police." (4RR-85). The Officer ultimately caught up to the suspect and with the help of a fellow police officer, arrested the suspect and handcuffed him. (4RR-87). The suspect was hoisted over the fence by several officers and put the suspect in Hutnyak's patrol car. (4RR-89).

Dr. Samantha Evans, a medical examiner with the Bexar County Medical Examiner's Office testified that she performed an autopsy on Mr. Tenorio and concluded that he died of multiple traumatic injuries. (4RR-109). She labeled Tenorio's manner of death as an accident. (4RR-109).

SAPD crime scene Detective Kelly Bender testified she traveled to the scene of the collision on Loop 410 on September 21, 2012. (4RR-111). She was supervising a newly promoted Detective, Jeffrey Rhinehart that evening and went to the scene in order to collect a gunshot residue test. (4RR-111). She collected a shotgun, as well as 9 unfired shotgun shells that were retrieved from the fence line outside the bus yard. (4RR-113).

SAPD crime scene unit officer Raul Hurtado next testified that on September 22, 2012, he traveled to the impound parking lot and inspected and photographed the Suzuki Reno vehicle. (4RR-122). He also inspected and photographed a 2003 silver Hyundai. (4RR-122). Hurtado stated he collected a firearm from the Suzuki's trunk area. (4RR-130). He also stated he collected a sock full of shotgun shells and a white plastic mask from the interior of the Hyundai. (4RR-131-2).

The State then rested their case. (4RR-135). The Defense then made a Motion for

21

a "judgment of instructed verdict to the jury," which was denied. (4RR-136-7).

A hearing was conducted outside the jury's presence wherein Garza stated that he had to testify because his trial counsel failed to bring forward witnesses to testify for the defense. (4RR-138-40). Trial counsel testified that he had advised Garza not to testify. (4RR-139).

The Defense then called the Defendant, Benito Garza, to testify. (4RR-141). He stated he was thirty-eight years old, disabled but had not been employed since 1997 but that he had graduated from high school. (4RR-141). Garza stated he became paralyzed on the left side of his body when he was nineteen years old. (4RR-144). Garza had to have two brain surgeries. (4RR-145). Garza explained he suffered anxiety, panic attacks, manic depression with psychosis, insomnia and seizures. (4RR-148). Garza also told the jury that he had been incarcerated in the Bexar County Jail for the previous two years. (4RR-147). Garza stated that on the day of the incident, he was in the Five Palms area around seven in the evening. (4RR-149). Garza adamantly denied committing a robbery on that day. (4RR-150). Instead, Garza stated he was in the neighborhood to sell the shotguns (which were registered to his child's mother) that he possessed to Michael and Jesse, the occupants of the house on 5159 Sagamore. (4RR-150). Garza admitted he also bought marijuana from the people at the Sagamore address. (4RR-150). He went to the Sagamore house that day to retrieve his guns and to retrieve what "they promised to give me." (4RR-150). Garza said he was going to sell the shotgun and the shotgun shells for two quarter pounds of marijuana and $150. (4RR-151). Because Michael and Jesse

22

did not fulfill their part of this contract, Garza decided to go over to the Sagamore house to retrieve his property. (4RR-152). When Garza arrived at the house, he started arguing with Michael and wanted his shotguns back. (4RR-152). Garza normally bought marijuana from Michael's father, Jay, so when Jay came out, Garza explained the "deal" to him. (4RR-153). Jay then walked with his son, then returned to Garza and said "...if I give it to you, will you leave? Will you leave if I give it to you?" (4RR-153). Garza told Jay that he was going to leave. (4RR-153). Jay then brought the shotguns to Garza and they were stored in the vehicle. (4RR-154). However Garza and Michael were still arguing, so Garza left. (4RR-155). While driving away, Garza saw a police vehicle and tried to stay calm because he has had bad experiences with the police in the past. (4RR-157). He related that when he was arrested this time, a police officer put his boot on Garza's face which fractured his cheekbone and lower eye socket. (4RR-158). Garza was unable to understand what happened before he was arrested. (4RR-161). The last thing he remembered after he saw the police were chasing him was him going to the curb. ( 4RR-162). Garza denied being in a collision. (4RR-162). Garza remembered giving a recorded interview to the police but stated he kept saying, "I'm ain't going to believe it until I see it." (4RR-165). Garza stated he did not experience it but that he had no recollection of "this." (4RR-165). Garza related that when "..they talked about a black car, I didn't even know no black car. And then they say that the black car ran over Mr. Tenorio. I was like, in my mind and in my heart, I was like, 'Wow, maybe I didn't take a life, you know, maybe there's a little chance that...if I did hit him, which I can't

remember, but if I did hit him, and he ... survived, that means he survived, and—and the car is the one that did that." That don't make it better that...I lost my mind, but —I'm sorry, but it made me feel like, okay, like, maybe I haven't took no human life." (4RR-165). Garza admitted to learning that Mr. Tenorio passed away from the trial but that he wanted his doctor in court to explain what happened to Garza." (4RR-166). The last thing Garza remembered from that night was being in the Magistrate building. (4RR-166). Garza also believed that when Officer Zachary was behind him, Garza pulled over, however he then said he did not remember that. (4RR-167). Garza denied knowingly or intentionally fleeing from the police. (4RR-170). Garza admitted that after he was paralyzed, he "caught" a felony. (4RR-171). Garza explained he had been under the care of Dr. Sanchez since he was paralyzed at the age of nineteen and being treated with medication for his post-traumatic stress syndrome. (4RR-172). Garza stated he did not want Mr. Tenorio to die and that Mr. Tenorio did nothing wrong. (4RR-173). Garza did admit it was his circumstance that killed Mr. Tenorio, "If it was a mistake on me, then it was me that did it." (4RR-173). Garza again reiterated that he knew he was charged with murder, but that he was not a murderer. (4RR-173). On cross-examination, Garza admitted there were differences between what he told the police on the night of the collision and to what he had testified. (4RR-175). Garza did not tell the police about wanting to sell the guns, but that he went to retrieve the shotguns that were stolen from him. (4RR-175). Garza admitted that the police were lying to him about what had happened so he thought "Why be honest with them?" (4RR-177). Garza admitted he was

24

driving his mother's vehicle on September 21, 2012. (4RR- 180).

Psychiatrist Dr. Ramon Victor Sanchez next testified he treated Garza from 2009 until 2012 for management of post-traumatic stress disorder caused by a carjacking where Garza sustained traumatic brain injury when he was hit in the head with a bat. (4RR-191). The doctor explained Garza was paralyzed for a two year period but that he was able to become ambulatory, however he was suffering from emotional and cognitive impairment. (4RR-192). The doctor stated Garza suffered from an inability to make calculations and that his judgment was impaired, but that because the doctor was unable to conduct a neuropsychological evaluation, the extent of Garza's impairment was unknown. (4RR-192). The doctor explained Garza's brain injury caused cognitive deficits. (4RR-193). The doctor noted that Garza's panic attacks make him feel as if he is having a heart attack or is going to die so that he wants to flee, "it builds up such a degree of fear that one wants to either flee from the situation that's causing the acute stress or fight against the situation . . . which is usually an involuntary response. (4RR-193-4). The doctor stated that in Garza's situation his initial thought would be that it would be an involuntary response. (4RR-195). The doctor also stated that individuals with this disorder usually remember the incident, however with Garza's traumatic brain injury and his post-traumatic stress disorder, Garza could have had a dissociate defense, which is an out of body experience where one doesn't remember the acute stressor as a means to try to cope with the acute stressor, "so you can certainly have–not remember." (4RR-195). Unfortunately, because the doctor did not evaluate Garza right after the

25

event, he could not form a diagnosis. (4RR-196). The doctor did note that it was possible that Garza did not remember the events that happened immediately after flight. (4RR-196). The doctor did admit that he recommended Garza engage in cognitive behavioral therapy but that it is difficult to find a therapist that accepts Medicare or Medicaid. (4RR-201). The doctor clearly stated that the medical and mental condition that Garza suffers from cannot be "fixed," but can get better, although never back to the baseline or what is considered normal prior to the post traumatic stress disorder. (4RR-201). The doctor explained that the use of marijuana by such a patient could cause impairment to an already impaired cognitive functioning. (4RR-203). The Defense then rested its case. (4RR-204).

Both paragraphs of the indictment were submitted to the jury without a unanimity instruction being requested, or instructed. (5RR-4-16). After closing arguments, the jury was polled and all twelve members found Garza guilty of both counts. (5RR-39).

During the punishment phase, Garza initially pleaded "not true" to the enhancement paragraph, "And it is further presented in and to said Court that, before the commission of the offense above, on the 19th Day of March, A.D., 1998, in Cause Number 1998CR1443W, in Bexar County, Texas. The Defendant [Garza] was convicted of the felony of possession of a controlled substance, penalty group one, four to 200 grams." (6RR-3). After asking the trial court for clarification, Garza changed his plea and admitted to being convicted of the 1998 offense alleged in the indictment. (6RR-4). The trial court then admonished Garza that because of his plea, the punishment range for

the felony murder conviction was raised from the minimum of five years imprisonment to the minimum of fifteen years imprisonment. (6RR-4). The trial court then carefully informed Garza that he had the right to make the State prove that he had been previously convicted of a felony offense in order to obtain a minimum of fifteen years in prison, so then Garza again changed his plea to the enhancement paragraph to "not true." (6RR-5). After much vacillation, Garza finally entered into a stipulation that he had been previously convicted of the 1998 felony. (6RR-9).

Roxana Tenorio testified the she suffered from numerous gruesome injuries as a result of the collision, and was in the hospital for seventeen days. (RR6-12). She explained she was married to Pedro Tenorio, the deceased, on November 8, 2011. (6RR-15). She stated she had two children. (6RR-15). She tearily described how Pedro's death affected her life. (6RR-16). The State then rested. (6RR-18).

The Defense called Annette Lopez, Garza's sister, who testified that she and Garza were very, very close. (6RR-20). She said Garza always wanted to be a veterinarian, or in the Armed Forces. (6RR-20). She stated that after the traumatic injury Garza received when he was nineteen, he went downhill: he had trouble communicating; concentrating; he would hit himself in the head; he could not take the pain. (6RR-20). She stated Garza was seeing a psychiatrist. (6RR-21). She said Garza had problems with drugs. (6RR-22).

Maria Ann Rodriguez, Garza's Aunt, stated she knew Garza his whole life, that he was a good boy since he was little. (6RR-24). She said Garza was a good boy growing

27

up, that he had five brothers and two sisters who all lived in the same house, and were a close knit family. (6RR-26). She stated that after Garza finished high school, he was beat up and put in a coma. (6RR-27). She related that his behavior changed after that beating, that he was always sad but that he wanted to "go into the service." (6RR-27). She expressed that she, her husband, and her sister loved Garza very much. (6RR-27).

Defendant/Appellant Benito Garza then testified. He stated he did not disagree with their verdict and that he understand that range of punishment was from fifteen years in prison to life. (6RR-30). Garza tearfully apologized to Mrs. Tenorio for the death of her husband and the effect it had on her. (6RR-32). The Defense then rested. (6RR-33). After the Court's charge was read to the jury and the attorneys presented their closing arguments, the jury returned a verdict of sixty years imprisonment and a $0 fine. (7RR-15). Before the jury was excused, Garza stated he thought the Judge was going to sentence him, not the jury; he wanted it to be known that he was never given a choice to be sentenced by the jury or the judge. (7RR-16). However, Garza did sign an election to have the jury to impose the sentence. (CR-25).


**POINT OF ERROR ONE: THE DEFENDANT WAS EGREGIOUSLY HARMED WHEN THE TRIAL COURT FAILED TO GIVE A UNANIMITY INSTRUCTION TO THE JURY**

SUMMARY OF THE ARGUMENT

The fact that the indictment had two separate theories as to how Garza committed

28

murder to Tenorio without giving the jury a unanimity instruction combined with the Prosecution's argument that the jury did not have to be unanimous as how they believed Garza committed felony murder was caused, Garza suffered egregious harm and as such, he is entitled to a new trial.

## ARGUMENTS AND AUTHORITIES

Under our state constitution, jury unanimity is required in felony cases, and, under our state statutes, unanimity is required in all criminal cases. Ngo v.State, 175 S.W.3d 738 (Tex. Crim. App. 2005). Unanimity in this context means that each and every juror agrees that the defendant committed the same, single, specific criminal act. Id. Stealing a credit card on Monday is not the same specific criminal offense as receiving a stolen credit card on Tuesday or presenting a stolen credit card to a bartender on Wednesday. Id. Indeed, stealing a credit card at 9:00 a.m. on Monday is not the same specific criminal offense as receiving a stolen credit card at 9:00 a.m. on Monday. Id. These are all credit card abuse offenses, to be sure, but they are not the same, specific credit card abuse criminal acts committed at the same time or with the same mens rea and the same actus reus. Id. The applicable law is that reversal for an unobjected-to erroneous jury instruction is proper only if the error caused actual, egregious harm to an appellant. Ngo v. State, 175 S.W.3d 738, 743-44 (Tex. Crim. App. 2005). "An egregious harm determination must be based on a finding of actual rather than theoretical harm." Cosio v. State, 353 S.W.3d 776-7 (Tex. Crim App. 2011). Actual harm is established when the erroneous jury instruction affected "the very basis of the case," "deprive[d] the defendant

29

of a valuable right," or "vitally affect[ed] a defensive theory." Id. (citing Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). "An egregious harm determination must be based on a finding of actual rather than theoretical harm." Cosio, 353 S.W.3d at 777. Actual harm is established when the erroneous jury instruction affected "the very basis of the case," "deprive[d] the defendant of a valuable right," or "vitally affect[ed] a defensive theory." Id. (citing Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)).

## Standard of Review

In Cosio, the court explained that four factors should be analyzed to determine whether an appellant was egregiously harmed by an erroneous jury instruction. When assessing harm based on the particular facts of the case, it should consider (A) the entire jury charge; (B) "the state of the evidence[,] including contested issues and the weight of the probative evidence"; (C) the parties' arguments; and (D) all other relevant information in the record. Cosio, supra. (citations omitted). The Almanza analysis is fact specific and is done on a "case-by-case basis." Gelinas v. State, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013). See generally, Arrington v. State, ____ S.W.3d ____, NO. PD-1448-13, 2015 Tex. Crim. App. LEXIS 15 (Tex. Crim App. 2015).

## Arguments and Authorities

In the present case, The Appellant was charged in a one count indictment for the the offense of the murder of Pedro Tenorio, enhanced by one prior felony conviction. (CR-5). Paragraph A alleged that on September 21, 2012, Garza committed or attempted

30

to commit the felony offense of evading arrest in a vehicle and while in the course of or in furtherance of or in immediate flight from the commission or attempted commission of this offense , Garza did then and there commit or attempt to commit an act clearly dangerous to human life to-wit,

DRIVING A MOTOR VEHICLE AT A SPEED THAT WAS NOT REASONABLE OR PRUDENT UNDER THE CIRCUMSTANCES THEN EXISTING, DRIVING A MOTOR VEHICLE AND FAILING TO APPLY THE BRAKES IN A TIMELY AND REASONABLE MANNER AND/OR DRIVING THE MOTOR VEHICLE INTO ONCOMING TRAFFIC, DRIVING A MOTOR VEHICLE AND ATTEMPTING TO PASS ANOTHER MOTOR VEHICLE WHEN IT WAS NOT REASONABLE AND PRUDENT UNDER THE CIRCUMSTANCES THEN EXISTING, DRIVING A MOTOR VEHICLE AND FAILING TO MAINTAIN A SINGLE LANE OF TRAFFIC, DRIVING A MOTOR VEHICLE AND FAILING TO TAKE NECESSARY EVASIVE ACTION TO AVOID COLLIDING WITH ANOTHER VEHICLE IN/ON WHICH THE COMPLAINANT WAS A DRIVER OR PASSENGER WHICH CAUSED THE DEATH OF AN INDIVIDUAL, NAMELY: PEDRO TENORIO."

Paragraph B of the indictment alleged that on or after the 21st day of September 2012, BENITO GARZA...did then and there commit or attempt to commit the felony offense of Robbery/Threats and in furtherance of or in immediate flight from the commission or the attempted commission of this offense, the defendant did then and there commit or attempt to commit an act clearly dangerous to human life, to-wit:

DRIVING A MOTOR VEHICLE AT A SPEED THAT WAS NOT REASONABLE OR PRUDENT UNDER THE CIRCUMSTANCES THEN EXISTING, DRIVING A MOTOR VEHICLE AND FAILING TO APPLY THE BRAKES IN A TIMELY AND REASONABLE MANNER AND/OR DRIVING THE MOTOR VEHICLE INTO ONCOMING TRAFFIC, DRIVING A MOTOR VEHICLE AND ATTEMPTING TO PASS ANOTHER MOTOR VEHICLE WHEN IT WAS NOT REASONABLE AND PRUDENT UNDER THE CIRCUMSTANCES THEN EXISTING, DRIVING A MOTOR VEHICLE AND FAILING TO MAINTAIN A SINGLE LANE OF TRAFFIC, DRIVING A MOTOR VEHICLE AND FAILING TO TAKE NECESSARY EVASIVE ACTION TO AVOID COLLIDING WITH ANOTHER VEHICLE IN/ON WHICH THE

31

COMPLAINANT WAS A DRIVER OR PASSENGER WHICH CAUSED THE DEATH OF AN INDIVIDUAL, NAMELY: PEDRO TENORIO." (CR-5-6).

The jury charge only mentioned the boiler plate language that the verdict must be unanimous but did not apply the instruction as to both paragraphs in the indictment.(CR-5-6).

As to Paragraph B of the indictment, the State had to prove that Garza committed the felony offense of robbery/threats. Tex Penal Code § 29.02 sets out that in order for a person to commit robbery, (a) A person commits an offense if, in the course of committing theft as defined in Chapter 31 and with intent to obtain or maintain control of the property, he:

(1) intentionally, knowingly, or recklessly causes bodily injury to another; or

(2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.

The evidence at trial was that a 911 call was made, however no victim or witness gave substantive testimony that Garza had committed theft of any kind or placed anyone in the course of committing theft in fear of imminent bodily injury or death while committing theft. Thus the evidence was legally insufficient to convict Garza of robbery by threats as alleged in the Indictment. Hence Garza was legally not in immediate flight from the commission or the attempted commission of a robbery.

As to paragraph A of the indictment, the State must prove one is guilty of Evading Arrest or Detention if, (a) A person commits an offense if he intentionally flees from a

32

person he knows is a peace officer or federal special investigator attempting lawfully to arrest or detain him, (b) [2 Versions: As amended by Acts 2011, 82nd Leg., chs. 391 and 839] An offense under this section is a Class A misdemeanor, except that the offense is:

(1) a state jail felony if:

(A) the actor has been previously convicted under this section; or

(B) the actor uses a vehicle or watercraft while the actor is in flight and the actor has not been previously convicted under this section;

(2) a felony of the third degree if:

(A) the actor uses a vehicle or watercraft while the actor is in flight and the actor has been previously convicted under this section; or

(B) another suffers serious bodily injury as a direct result of an attempt by the officer or investigator from whom the actor is fleeing to apprehend the actor while the actor is in flight; or

(3) a felony of the second degree if another suffers death as a direct result of an attempt by the officer or investigator from whom the actor is fleeing to apprehend the actor while the actor is in flight.

(b) [2 Versions: As amended by Acts 2011, 82nd Leg., ch. 920] An offense under this section is a Class A misdemeanor, except that the offense is:

(1) a state jail felony if the actor has been previously convicted under this section;

(2) a felony of the third degree if:

(A) the actor uses a vehicle while the actor is in flight;

(B) another suffers serious bodily injury as a direct result of an attempt by the officer from whom the actor is fleeing to apprehend the actor while the actor is in flight; or

(C) the actor uses a tire deflation device against the officer while the actor is in flight; or

(3) a felony of the second degree if:

(A) another suffers death as a direct result of an attempt by the officer from whom the actor is fleeing to apprehend the actor while the actor is in flight; or

(B) another suffers serious bodily injury as a direct result of the actor's use of a tire deflation device while the actor is in flight.

(c) In this section:

(1) "Vehicle" has the meaning assigned by Section 541.201, Transportation Code.

(2) "Tire deflation device" has the meaning assigned by Section 46.01.

(3) "Watercraft" has the meaning assigned by Section 49.01.

(d) A person who is subject to prosecution under both this section and another law may be prosecuted under either or both this section and the other law.

The evidence submitted in Garza's case was clear that he evaded the police but there was a significant issue as to whether he caused the death of Tenorio. While it is undisputed that Garza was driving the wrong way on a highway and collided with Tenorio's motorcycle, it was also clear that Tenorio was also severely injured when the driver of the Black Suzuki hit or ran over Tenorio. Mrs. Tenorio survived the impact with Garza's vehicle and survived. Thus the evidence was not conclusive that Garza's evading arrest caused the death of Pedro Tenorio.

## POINT OF ERROR TWO: THE ERRONEOUS JURY CHARGE EGREGIOUSLY HARMED GARZA

### Summary of the Argument

After considering the entirety of the jury charge, the substantive evidence, including the contested issues and the weight of the probative evidence, the arguments of the State's counsel, and any other relevant information revealed by the trial record as a whole, the iclear result was that Garza was deprived of a unanimous verdict.

As explained in Arrington, the error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. See Id.; see also Allen v. State, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008). Egregious harm is a "high and difficult standard" to meet, and such a determination must be "borne out by the trial record." Reeves v. State, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013) (citations omitted). On appeal, neither party bears the burden of showing harm or a lack thereof under this standard. Warner v. State, 245 S.W.3d 458, 464 (Tex. Crim. App.

35

2008).

## Standard of Review

Courts will not reverse a conviction unless the defendant has suffered "actual rather than theoretical harm." Cosio v. State, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011). In examining the record to determine whether charge error has resulted in egregious harm to a defendant, we consider (1) the entirety of the jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the trial record as a whole. Almanza, 686 S.W.2d at 171.

## Arguments and Autorities

When the jury charge only explains in boilerplate language that the verdict must be unanimous, added by the fact the State told the jury in voir dire and in closing arguments that the jury did not have to agree unanimously beyond a reasonable doubt as to whether Garza caused Tenorio's death in either the allegations in paragraph A or B, egregious harm occurs. Ngo, at 750.

Notwithstanding trial counsel's numerous errors, omissions and likely failure to have a meaningful conversation with Garza about his testimony, Garza is entitled to a new trial because the lack of the unanimity instruction rendered his trial fundamentally unfair in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution, Garza suffered obvious egregious harm when the trial court failed to properly instruct the jury on the law of unanimity.

36

## PRAYER

WHEREFORE, PREMISES CONSIDERED Appellant BENITO GARZA respectfully prays that his Honorable Court reverse his conviction and grant a new trial.

Respectfully submitted,

CAMPION & CAMPION

_____
ALEX J. SCHARFF
State Bar No. 17727350
222 E. Main Plaza
San Antonio, Texas 78205
Telephone No. 210/227-5161
Telecopier No. 210/229-1243
alexjoss@yahoo.com
cindy@campionlawfirm.com

ATTORNEY FOR APPELLANT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the following Brief for Appellant was delivered to the Bexar County District Attorney's Office on this 18 day of February, 2015.

_____
ALEX J. SCHARFF